No. 24-1431

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

JESSE SUTHERLAND,
*Plaintiff-Appellant*
v.

PETERSON'S OIL SERVICE, INC.
*Defendant-Appellee*

---

On Appeal from the United States District Court
for the District of Massachusetts

Case No. 4:21-cv-10902-MRG
The Honorable Margaret R. Guzman

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

Lucas Newbill
1st Cir. Bar # 1192218
Law Offices of Lucas Newbill
P.O. Box 1741
Brookline, Massachusetts 02446
Tel. 617-918-7567
lucas@lucasnewbill.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                4

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD          8

JURISDICTIONAL STATEMENT                                    8

STATEMENT OF ISSUES                                          9

STATEMENT OF THE CASE                                        10
    I. Relevant Facts                                     10
    II. Procedural history                                21
    III. Rulings presented for review                     21

SUMMARY OF ARGUMENT                                          22

ARGUMENT                                                     24
    I. Standard of Review                                 24
    II. Peterson's Oil Violated the ADA and Chapter 151B     25
    a. Peterson's Oil did not accommodate or engage in any
        interactive process in response to Mr. Sutherland's
        reasonable requests for doctor-recommended eight
        and six-hour workdays because of his torn meniscus,
        arthritis, and torn ACL                           25
    b. It would be hard to find a juror that could reasonably
        conclude that Mr. Sutherland was *not* disabled        29
    c. A six-hour workday is a reasonable accommodation at
        Peterson's Oil, not the least because it is afforded to
        another technician                                33
    d. Mr. Sutherland had a record of disability when he was fired
        without logical justification in one of the most bizarre
        manners possible, without being told for months.      35
    e. Mr. Sutherland was the only tech fired out of fifteen and
        the only one on accommodation leave at a time that
        they needed more technicians.  Coincidence?  A
        reasonable jury could think not.                  36
    III. A reasonable jury could conclude that Mr. Sutherland
        was terminated because of his opposition to biofuel,
        which is protected activity                       38

CONCLUSION                                          40

CERTIFICATE OF COMPLIANCE                            41

CERTIFICATE OF SERVICE                               41

ADDENDUM                                            42

## TABLE OF AUTHORITIES

**Cases**

Bajandas v. Cupeyville, Inc.,
      61 F. Supp. 3d 218 (D.P.R. 2014)              26

Beck v. Univ. of Wis. Bd. of Regents,
      75 F.3d 1130 (7th Cir.1996)              27

Barbuto v. Advantage Sales and Marketing, LLC,
      477 Mass. 456, 78 N.E.3d 37 (2017)          37

Bultemeyer v. Ft. Wayne Community Schs.,
      100 F.3d 1281 (7th Cir. 1996)            26

Calero-Cerezo v. US Dep't. of Justice,
      355 F. 3d 6 (1st Cir. 2004)              23,26,27,28,29,33

Criado v. IBM Corp.,
      145 F.3d 437 (1st Cir. 1998)              36

Elliott-Lewis v. Abbott Laboratories, Inc.,
      No. 14-CV-13155-IT,
      2018 WL 1122359 (D. Mass. Mar. 1, 2018)     38

Eshleman v. Patrick Indus., Inc.,
      961 F.3d 242 (3d Cir. 2020)              31

Faidley v. United Parcel Service of America, Inc.,
      889 F. 3d 933 (8th Cir. 2018)            34

Falcon v. Leger,
      62 Mass. App. Ct. 352, 816 N.E.2d 1010 (2004)    38

Flagg v. AliMed, Inc.,
      466 Mass. 23, 992 N.E.2d 354 (2013)          30,36

Freadman v. Metro. Prop. & Cas. Ins. Co.,
      484 F.3d 91 (1st Cir. 2007)              28,37

Hamilton v. Westchester Cnty.,
    3 F.4th 86 (2d Cir. 2021)               31

Hobson v. McClean Hospital,
    402 Mass. 413, 522 N.E.2d 975 (1988)      38

Kinzer v. Whole Foods Mkt., Inc.,
    99 F.4th 105 (1st Cir. 2024)            24

Mandel v. Bos. Phoenix, Inc.,
    456 F.3d 198 (1st Cir. 2006)            25

Malley v. Massachusetts Off. on Disability,
    No. 17-P-1413, 2019 WL 1254697,
    (Mass. App. Ct. Mar. 18, 2019)          36

Mancini v. City of Providence,
    909 F.3d 32 (1st Cir. 2018)          29,31,32,33,35

Massasoit Indus. Corp. v. Massachusetts
    Comm'n Against Discrimination,
    91 Mass. App. Ct. 208, 73 N.E.3d 333 (2017)    29,31

Mengine v. Runyon,
    114 F.3d 415 (3d Cir.1997)            27

Mesnick v. Gen. Elec. Co.,
    950 F.2d 816 (1st Cir. 1991)            37

Mistishen v. Falcone Piano Co. Inc.,
    36 Mass. App. Ct. 243, 630 NE.2d 294 (1994)    39

Murray v. Warren Pumps, LLC,
    821 F.3d 77 (1st Cir. 2016)            38

Palmer v. McDonald,
    824 F. App'x 967 (11th Cir. 2020)       26

Reed v. LePage Bakeries, Inc.,

244 F.3d 254 (1st Cir. 2001)                                        10,26

Rocafort v. IBM Corp.,
    334 F.3d 115 (1st Cir. 2003)                              25,26

Sec. & Exch. Comm'n v. Jarkesy,
    No. 22-859, 2024 WL 3187811 (U.S. Jun. 27, 2024)         25

Summers v. Altarum Institute, Corp.,
    740 F. 3d 325 (4th Cir. 2014)                             30,31

Surprise v. Innovation Grp., Inc. / First Notice Sys., Inc.,
    925 F. Supp. 2d 134 (D. Mass. 2013)                       19,38

Taylor v. Principal Fin. Group, Inc.,
    93 F.3d 155 (5th Cir. 1996)                               27

Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,
    534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)       30

Workman v. Outfront Media, LLC,
    474 F. Supp. 3d 373 (D. Mass. 2020)                       37

Wright v. CompUSA, Inc.,
    352 F.3d 472 (1st Cir. 2003)                              29,36

Zivkovic v. S. California Edison Co.,
    302 F.3d 1080 (9th Cir. 2002)                             26

**Statutes and Acts**

28 U.S.C. § 1331                                                    8

28 U.S.C. § 1343                                                    8

42 U.S.C. § 12102                                                   39,30,31,32

42 U.S.C. § 12111                                                   33

42 U.S.C. § 12112                                       8,25

42 U.S.C. § 12203                                       8

M.G.L. c. 151B, § 4                                     8,9,21,22,25
                                                        29,31,36,37

28 U.S.C. § 1291                                        8

ADA Amendments Act of 2008,
     Pub.L. No. 110-325, 122 Stat. 3553                 29,30

**Rules**

Fed. R. App. P. 4(a)(1)(A)                              8

29 C.F.R. § 1630                                        28,31

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

This case involves issues important to the functioning of the Americans with Disabilities Act (ADA). When public safety necessitates the common law doctrine of wrongful termination also deserves argument. Moreover, there are many facts to this case, necessitating that most of them – and their record citations – lie within the facts rather than the argument section. Oral argument can help connect the dots. Wherefore, Mr. Sutherland respectfully requests it.

**JURISDICTIONAL STATEMENT**

Plaintiff-Appellant is Mr. Jesse Sutherland (Mr. Sutherland), a former employee of Defendant-Appellee, Peterson's Oil Service, Inc (Peterson's Oil). The District Court had original jurisdiction under 28 U.S.C. §§ 1331, 1343(a), and 1367 as this case presents claims arising under federal law, *e.g.*, the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112 and 12203, and claims under state law, *e.g.*, M.G.L. c. 151B, § 4 and common law unlawful termination, that are part of the same controversy; Appx. 26-65 (case involves discrimination, failure to accommodate, and retaliatory and unlawful termination).

This Court has jurisdiction over this appeal from the District Court's grant of summary judgment on March 31, 2024, and entry of final judgment for the defendant on April 3, 2024; Appx. 9; under 28 U.S.C. § 1291 and Fed. R. App. P.

4(a)(1)(A).  Mr. Sutherland timely filed his notice of appeal on April 29, 2024;

Appx. 9.

## STATEMENT OF ISSUES

1. Whether the district court erred in granting Peterson's Oil's motion for summary judgement and entering final judgment for Peterson's Oil on Mr. Sutherland's claims that Peterson's Oil failed to accommodate or engage in any interactive process to accommodate Mr. Sutherland's work restrictions in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Massachusetts analog, M.G.L. c. 151B, § 4.

2. Whether the district court erred in granting Peterson's Oil's motion for summary judgment and entering final judgment for Peterson's Oil on Mr. Sutherland's claims that Peterson's Oil violated the ADA and c. 151B when it terminated Mr. Sutherland's employment in retaliation for taking leave thereunder.

3. Whether the district court erred in granting Peterson's Oil's motion for summary judgment and entering final judgment for Peterson's Oil on Mr. Sutherland's claims that Peterson's Oil violated the ADA and c. 151B when it terminated Mr. Sutherland's employment because he had a record of being disabled.

4. Whether the district court erred in granting Peterson's Oil's motion for summary judgment and entering final judgment for Peterson's Oil on Mr.

Sutherland's common law claim that he was wrongfully terminated in violation of public policy because he was outspoken both within the company, including management, and to its customers, that Peterson's Oil's high content biofuel was destroying customers' home heating systems and placing them in danger.

## STATEMENT OF THE CASE

### I. Relevant Facts

Headquartered in Worcester, Peterson's Oil delivers home heating oil to about 15,000 homes. Appx 317, 320. Peterson's Oil is owned by Howard Peterson, Jr. (Mr. Peterson) and his family, including his daughter, Kristen Peterson Halus (Ms. Peterson Halus). Appx 298. Mr. Peterson serves as president; Appx 299; and his daughter as vice president; Appx 936.

Jesse Sutherland began working as a service technician for Peterson's Oil in August of 2019. Appx 46. Mr. Sutherland was no guppie, having taken his first job as an oil service technician in 1989. Appx 369-372. The general job responsibilities were to "work[] on oil burners. Anything from cleaning and servicing. What [*sic*] we call tuneups to no heat calls to replacing parts or making repairs, putting in water heaters, tankless coils, various piping repairs, things like that." Appx 416. When Mr. Sutherland was hired, he bargained to *not* do installations and *not* take on-call shifts. Appx 416-18. On-call shifts are night shifts. Appx 324. Ms. Peterson-Halus and Mr. Morris agreed to both terms. Appx

47, 416-18.  Thus, obviously, on-call work and installations are *not* essential functions of the job.  This is further evidenced by the fact that around *half* of Peterson's Oil's techs do *not* do install work; Appx 80-81; and two other techs do *not* do on-call work; Appx 182 n.6.  Mr. Sutherland's request to *not* take night shifts was respected; Appx  417; his request to *not* do installations was *not*; Appx 416-18, 679 (Oct. 28, 2019), 686-90 (Oct. 29, 2019); 790 (Dec. 5, 2019), 821 (Dec. 18, 2019); 851 (Dec. 30, 2019), 866 (Jan. 8, 2020), 895 (Jan. 20, 2020). Regardless, *neither* had anything to do with Mr. Sutherland's later accommodative requests for a shortened workday.

Mr. Sutherland's direct manager was Ryan Morris; Appx 47; and *de facto* manager was dispatcher Diana Costigan, to whom he reported daily.  Appx 414-15. Ms. Costigan was a go-between management, Ms. Peterson-Halus and Mr. Morris, and the service technicians, Mr. Sutherland included.  Appx 11, n.1, 152-157, 637, 791, 852, 863.  Ms. Peterson-Halus, Mr. Morris, and even Mr. Peterson dictated work to Mr. Sutherland through Ms. Costigan; Appx 153, 637, 863.  Ms. Costigan was the eyes and ears of the company.

Mr. Sutherland's knee injury happened on October 8, 2019 – he told Ms. Costigan the same day.  Appx 68, 632-34.  Mr. Sutherland continued working without request for accommodation until November 21, 2019.  But more on that later.

Peterson's Oil provides home heating fuel termed "Clean Heat."  Appx 514-15.  Clean Heat has a biofuel content of between 45 and 85 percent.  Appx 310.  Today's oil burners are made to burn 15 or 20% biofuel, *not* higher.  Appx 621-628.  Providing the kind of elevated bio content that Peterson's Oil does is not only way outside standard practice; Appx 527; the impacts on home heating systems are devastating, causing *routine* heat failure and oil leaks and carbon monoxide and fire hazards that threaten homes and lives.  Appx 402-14, 458-463, 517, 529, 534-37, 605-14.  These are not remote risks, the destruction was witnessed daily by Mr. Sutherland.  Id.  It is not a question of if, but when, someone will die because of Peterson's Oil's practices.  Appx 534.  Peterson's Oil customers, of course, did not know this.  Appx 526.  Mr. Sutherland let them know.  Appx 523, 525.

On November 1, 2019, Logistics Manager Bahareh Pirayesh emailed Mr. Peterson and Ms. Peterson Halus to inform them that Mr. Sutherland had been complaining that day that all of Peterson's Oil's customers' heating issues come from biofuel.  Appx 286, 331-32, 357, 994.  Later that same day, Ms. Peterson Halus instructed Ms. Costigan to stop sending Mr. Sutherland on "no heat" calls because Mr. Sutherland was telling customers about his "negative view of bio."  Appx 152-157, 291.  Comically, at deposition, Ms. Peterson Halus testified that it was no problem that Mr. Sutherland was telling customers about the harms of

biofuel.  Appx 152-57, 291.  Clearly it was, or she would not have tried to divert him from doing so.

November 1st was not the first time that Mr. Sutherland voiced his concerns about high content biofuel, nor would it be the last.  Mr. Sutherland's complaints about biofuel were prolific, including to Mr. Morris; Appx 465-66; and Mr. Peterson himself, who stared Mr. Sutherland down in response to his public comments at a service-wide company meeting held at a hotel in Worcester that Peterson's Oil was "f**ing" oil burners to burn biofuel; Appx. 455-56; the concern being safety.  Appx 458.  But undoubtedly who received the brunt of Mr. Sutherland's protests about the unsafe and harmful nature of biofuel was Ms. Costigan.  Appx 689, 729, 741 ("Riellos cant handle the high content bio.  I'm amazed it didn't catch fire.") (Nov. 15, 2019); 774 ("[G]ood case in point of what we talked about this morning.  Each and every oil call you have given me today was unnecessary issues due to cleanheat.") (Nov. 26, 2019); 776 ("This is a brand new boiler that was pissing high content bio out of the combustion chamber door. Shes lucky the house didn't go up in flames.") (Nov. 27, 2019); 778; 787 ("Keep pushing bio"); 788; 802; 813 (in response to no heat call, Mr. Sutherland wrote "It's got high content bio in it , Its actually quite sad we are pushing that stuff.."); 847 ("The bio has completely fucked up both BAD !!!!") (Dec. 27, 2019); 851 (Jan. 1, 2020); 894; 907 ("'once nice' now destroyed riello from the bio with a

chamber less boiler leaking fuel out of the door .  Buderus / riellos can not handle this fuel.") (Jan. 22, 2020); 908 (Jan. 22, 2020); 909 ("It was awesome to work on a burner with no bio….soooooclean , no mess !!!") (Jan. 23, 2020); 921 ("I didn't mind being there , I just dont much care for bio oil.") (April 8, 2020).

But returning to Mr. Sutherland's knees, on November 21, 2019, Mr. Sutherland texted Mr. Morris: "Hi Ryan, As you may have heard I've seemingly developed knee problems.  My right knees meniscus is torn pretty bad and my left is almost the same but better.  I had xrays yesterday and diagnosis.  I have an MRI to follow very soon.  The reason for this text is to ask for a bit of mercy…I'm going threw excruciating pain during my days working and just figured I'll push threw.  My doctor said that attitude is fine but it's making me worse.  So my question is, can I please cut back on hrs to 40 per week?  I can seem to muscle threw that and ice it at night.  My doctor thought that was even to much but I know Peterson needs the help.  I can get you doctor documentation if you see it nessaceary.  Thank you for understanding.  I will be needing surgery in the near future but will do my best to get threw winter."  Appx 181, 198.

Peterson's Oil paid absolutely no mind to Mr. Sutherland's request.  Appx 68.  On or around December 17, 2019, Mr. Sutherland provided Peterson's Oil a doctor's note stating that Mr. Sutherland had been seen on that date and that "[d]ue to his knee pain and swelling it is my recommendation that he work part time six

14

hours/day, 5 days/week starting on 12/18/2019 until further notice." Appx 178, 181, 200-01, 820. The text Peterson's Oil deemed "provided [to] Peterson's" in their MCAD position statement is the one he provided to Ms. Costigan. Compare Appx 181, 200-01 with Appx 820. Mr. Sutherland further texted Ms. Costigan: "I didn't have [surgery] yet…silly…the 27th of January is when its happening. I have 3 issues . 1 tourn meniscus  2 arthritis  3  acl damage.  That's why it hurts so friggin bad and he put me on 6 hr. Days .  It's about all I can take.  I come home every night with a knee I cannot bend and it takes about an hour with ice to get the swelling down enough to function again. . . .  [The doctor is] doing [surgery] quick because of how its affected my ability to work and live."  Appx 821.

Again, Peterson's Oil paid *no* mind to Mr. Sutherland's requests. Appx 68, 520. There was *no* response from Peterson's Oil's *at all*. Appx 68, 440-41.

> Q. And was your request for a 40-hour workweek
> ultimately granted?
> A. No.
> Q. Was it denied?
> A. It wasn't denied. It was just ignored.

Appx 441 (Mr. Sutherland's deposition).

> Q. After you requested to work less than six hours a day,
> were you asked to work more than six hours a day?
> A. Yes.
> Q. How often?
> A. Everyday.
> Q. How many hours a day did you work usually after
> your request for less than six hours a day?
> A. A lot of those days. There were some days I could get
> six hours in and that would be mostly because of

> my own basic shutoff of saying, I can't do
> anymore or -- I mean, there were days I do seven
> and a half, eight, eight and a half, could be nine but
> it didn't happen frequently. There were days, too,
> that I would step back at six and say, I can't take
> anymore.  More often than not, I worked more
> than six, though.

Appx 520 (Mr. Sutherland's deposition).

Mr. Sutherland worked through excruciating pain; Appx 518-520 (knee would swell, requiring removal of his brace, excruciating pain, tears to his eyes); sometimes over 10 hours, and even when approaching the eleventh hour, Peterson's Oil *still* asked Mr. Sutherland to do another call.  Appx 426, 617, 723. The *one* example that Peterson's Oil could find where Mr. Sutherland had purportedly declined to complete a service call – but in fact was being asked to go back because the owners were not home when he first went – was when he had a prearranged night off to spend time with his kids from his prior marriage.  Appx 53, 427-29, 616.  Again, Mr. Sutherland's deposition transcript is helpful to understand the defendant here.

> Q. And then the next section, could you read that for me?
> A. "Not a chance. Wednesday nights are kids' nights.
>     Can't do it."
> Q. And who said that, that text that you just read?
> A. That's me. That was very clear when I started there
>     that Wednesday nights -- I was a divorced dad and
>     Wednesday nights were my children's nights. No
>     ifs, ands or buts about it.
> Q. So in this exchange that you just read, are you
>     declining to take a call? . . . .
> THE WITNESS: Absolutely.

16

Appx 428. *This* is Peterson's Oil's evidence that they could not accommodate Mr. Sutherland.

Peterson's Oil contends that finishing a repair is an essential function of the job and that they could not accommodate Mr. Sutherland because Peterson's Oil cannot "guarantee" how long a service call will take. Appx 52. At deposition, Ms. Peterson Halus testified that she could "not at all" estimate the amount of time a call would take.

> Q. . . . . ARE YOU ABLE TO ESTIMATE THE
> AMOUNT OF TIME THAT ANY INDIVIDUAL
> CALL WILL TAKE FOR A TECHNICIAN?
> A. NO, NOT REALLY.
> Q. NOT AT ALL?
> A. NO.

Appx 99 (Ms. Peterson Halus' deposition).

Of course this was a blatant lie. She had to later recant it. Appx 118-19. Ms. Peterson-Halus and dispatchers certainly can and do estimate the time required for a service call. Appx 68-70, 118-19. Thus, at summary judgment, Peterson's Oil had to tweak their supposed essential function. Now it is that they could not accommodate Mr. Sutherland because they could not "guarantee" the time required for a job. Appx 52. Nothing in life is guaranteed, but we can – if we want – try. That's what Peterson's Oil failed to do here. Mr. Sutherland often did and was always asked to do work than six hours. Appx 520. Mr. Sutherland was sent out to do new jobs after he had worked more than a full day. Appx 426, 617, 723 (asked to do a new job after a 10 hour plus day). There was no real try on the part

17

of Peterson's Oil.  This is made pellucid by the fact that another technician at

Peterson's Oil, Mark Hume, works part time.  Appx 137, 229-30, 327, 485.  Of

course they can make it work, they do for others, just not Mr. Sutherland.

Mr. Suthlerand's knee, according to his doctor, caused "severe limitation of

functional capacity," requiring surgery on January 27, 2020, followed by six weeks

of physical therapy.  Appx 68, 172.  Following surgery, Mr. Sutherland underwent

two days of bedrest, four days of no weight-bearing activity, two weeks of

crutches, and three months of leave before he could return to work.  Appx 68.

On April 8, 2020, Mr. Sutherland texted Ms. Peterson Halus that he had

been cleared to return to work on April 20, 2020.  Appx 215.  On April 10, Mr.

Sutherland texted again, to which Ms. Peterson Halus replied that she would reach

out later that day.  Appx 216.  That would be the last time he heard from Ms.

Peterson Halus.  On April 14, Mr. Sutherland texted her: "Hi Kristen.  I still

haven't heard back from you and I'm getting worried.  I spoke to some of the other

techs that are out on leave at this point and was thinking you probably wanted me

to do the same?  Or take a layoff?  I'm just not sure what you want me to do seeing

how I haven't been able to speak with you.  Please let me know so I can prepare..

My granddaughter stays here during the days being both her parents are in essential

jobs , meaning I also have to be very careful of her by mixing with customers

during coronavirus."  Appx 218.

Ms. Peterson Halus says she understood Mr. Sutherland's Apr 14 text message to mean that he would not be able to perform service jobs because of his fear of contracting and exposing his granddaughter to coronavirus.  Appx 102.  But instead of letting Mr. Sutherland take leave under the Paycheck Protection Program (PPP) like she had for five (5) other service technicians that had *not* taken disability leave (save one back in 2019) or complained about biofuel; Appx 57, 104-110; Ms. Peterson Halus fired Mr. Sutherland.  It is also interesting how at deposition, Ms. Peterson Halus, taken surprise by the question *why didn't she offer PPP leave to Mr. Sutherland* like she did so many others, remembered that the others had submitted "formal written request[s]" – but once she was asked to produce them – she admitted that they had no template, she could not remember the details, she could not remember who submitted them, she could not remember whether they were emails . . . she basically could not remember anything.  Appx 105-07.  Unsurprisingly, there are no formal written PPP leave requests in the record.

Another big red flag is that *she didn't even tell Mr. Sutherland that he was fired*.  Appx 111.  She says she was too busy.  Appx 111.  Mr. Sutherland never received a termination letter.  Appx 450-51.  Once litigation ensued, abracadabra and Peterson's Oil had one, dated May 26, 2020, but with an effective date of April 20, 2020, the date Mr. Sutherland was cleared to return to work.  Appx 86-87, 171.

Ms. Peterson Halus could not remember when she wrote the letter or when she notified Mr. Sutherland that he was being terminated.  Appx 86-87, 90.

As if this weren't enough to sow reasonable doubt, Peterson's Oil claims it terminated Mr. Sutherland because the Coronavirus pandemic caused a decrease in service-related business, but running the numbers in terms of percentages from the spring of 2019 to 2020, these declines were less than the decline in technicians lost to PPP leave.  Appx 54-56, 104-110 (1/3 of technicians out because of Covid), 223-28 (from less than 1/10 to 1/3 decline in business across types and months from 2019 to 2020).  Peterson's Oil claims it switched the majority of its technicians to installations, and terminated Mr. Sutherland because he did not do them, but the numbers are more random than reflective of any general increase in installations when comparing the spring of 2019 with 2020.  Appx 228-29.  The numbers ring true to the fact that *half* of the technicians did *not* do installations. Appx 80-81.  Mr. Sutherland, on the other hand, *did* do installs when asked, even when he had a broken knee, so why wouldn't he when he was fit to return without restrictions after surgery?  Finally, a colossal problem for Peterson's Oil's is that another technician there in the Spring of 2020 swears that they are lying.  Appx 629-30.  Peterson's Oil technician Jeffrey Sergi, who "was a tech at Peterson's during the Spring of 2020," swears that "there was always plenty of daytime non-installation tech work at Peterson's throughout the Spring of 2020" because

20

"[m]any techs were on leave because of Covid." Appx 629. Mr. Sutherland was *not* terminated for lack of work because there was plenty. To conclude that *no* reasonable juror could conclude that Peterson's Oil is lying flies in the face of the summary judgment standard – and the historic principle that juries, not judges, shall try cases.

## II. Procedural History

The operative complaint was filed on June 17, 2022 and answer on July 1, 2022. Appx 5. Peterson's Oil filed its motion for summary judgment, memorandum in support, and Rule 56.1 statement on March 24, 2023. Appx 7-8. Mr. Sutherland filed his opposition and Rule 56.1 statement on April 14, 2023. Appx 8. Peterson's Oil filed a reply on April 28, 2023. Appx 8. Motion hearing was held on August 11, 2023; Appx 8; whereat the judge offered the parties the opportunity to supplement their briefing; Appx 1049; which the parties did on August 25, 2023. Appx 9. On March 31, 2024, the District Court entered its memorandum of decision and order and on April 3, 2024, final judgment in favor of the defendant. Appx 9. Mr. Sutherland filed his notice of appeal on April 29, 2024; Appx 9; and this appeal ensued.

## III. Rulings presented for review

Mr. Sutherland presents for review each of the trial judge's rulings as to his claims of (i) failure to accommodate under the ADA and c. 151B; (ii)

discriminatory discharge under the ADA and c. 151B; (iii) retaliatory discharge under the ADA; and (iv) common law wrongful termination in violation of public policy.

## SUMMARY OF ARGUMENT

The judge ruled that Mr. Sutherland's torn meniscus, arthritis, and torn ACL, which prevented him from bending his knee, limiting how long he could be on his feet working, causing excruciating pain, and requiring surgery, two days of bedrest, four days of no weight-bearing activity, two weeks of crutches, and three months of disability leave is *not* a disability under the ADA because "[Mr. Sutherland's] injury was temporary [and he fully recovered.]" Appx 17. This is not in keeping with the 2008 amendments to the ADA, which broadened the definition of "disability" to explicitly include temporary ones and lessen the focus on degree of impairment. The judge here mistakenly lasered in on the temporal nature and degree of impairment of Mr. Sutherland's knee. Appx 1043. A reasonable juror could conclude that Mr. Sutherland was disabled, was regarded as being disabled, and had a record of being disabled under the law as it exists today.

A request for accommodation is a notice standard pleading that may be made by plain words. Disabled employees should not have to know the law to get help. An interactive process was owed here, it was not given, and that is a violation of the law. Mr. Sutherland was not accommodated and a reasonable juror

could conclude that he could have been.  Peterson's Oil made *no* argument of

undue hardship below, but relied exclusively on essential functions of the job, *i.e.*,

the reasonableness of the request.  A change in an employee's schedule is a

common accommodation.  Cf. Calero-Cerezo v. US Dep't. of Justice, 355 F. 3d 6,

23 (1st Cir. 2004).[1]  It is easy for an employer to say that it cannot know how long

a job will take and that the job needs to be done ASAP.  It is important to

remember, however, that the ADA is an exception to at-will employment.

Whether something is essential cannot be made up out of thin air – it must be

sourced in something preexisting, a written job description, an offer, a contract, a

bargaining agreement – something with credibility.  And whether something is

truly essential to the performance of a job should be decided upon careful

consideration of the individual circumstances in play by a jury, people that

currently live and work in that same world.

    The judge's ruling as to the wrongful termination claim is also

unreconcilable with the law and facts.  The safety of home and person is a self-

evident public policy that Mr. Sutherland tried whole-heartedly to protect here.

The law requires nothing more than internal dissent with management.  Mr.

Sutherland did that and so much more.

---

[1]    Although Calero-Cerezo dealt with the Rehabilitation Act, "[t]he same
standards . . . apply to claims under the ADA and under the Rehabilitation Act."
Calero-Cerezo v. US Dep't. of Justice, 355 F. 3d at 11 n.1.

## ARGUMENT

### I. Standard of Review

"[This Court's] review of a district court's summary judgment decision is *de novo*. . . .  [This Court's] task is to determine whether the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. . . .  A genuine dispute is one which a reasonable jury could resolve . . . in the favor of the non-moving party, and a material issue is one with the potential to affect the outcome . . . under the applicable law." Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (citations omitted; quotations omitted).

"Our analysis look[s] to all of the record materials on file, including the pleadings, depositions, and affidavits, without evaluating the credibility of witnesses nor weigh[ing] the evidence. . . .  [W]e recite the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in the Employees' favor. . . .  The test for summary judgment is steeped in reality, however, and thus the Employees cannot rely on conclusory allegations, improbable inferences, and unsupported speculation." Kinzer v. Whole Foods Mkt., Inc., 99 F.4th at 108 (citations omitted; quotations omitted).

"[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *not* functions to be performed by a judge on summary judgment[.]"  Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 206 (1st Cir. 2006) (quotations omitted).  It is a founding principle that juries, not judges, should try cases.  See Sec. & Exch. Comm'n v. Jarkesy, No. 22-859, 2024 WL 3187811 (U.S. Jun. 27, 2024).

## II. Peterson's Oil Violated the ADA and Chapter 151B

### a. Peterson's Oil did not accommodate or engage in any interactive process in response to Mr. Sutherland's reasonable requests for doctor-recommended eight and six-hour workdays because of his torn meniscus, arthritis, and torn ACL.

"Under the ADA[2] an employer is required to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business."  42 U.S.C. § 12112(b)(5)(A); see also Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003) ("Under the ADA, an employer who knows of a disability yet fails to make reasonable accommodations violates the statute.") (Quotations omitted.)

---

[2]     Mr. Sutherland's c. 151B claims should be analyzed under the same framework as the ADA.  Cf. Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86-91 (1st Cir. 2012).

To survive summary judgment on a failure-to-accommodate claim, a plaintiff must prove that: "(1) he is disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [his employer], despite knowing of [his] disability, did not reasonably accommodate it." Rocafort v. IBM Corp., 334 F.3d at 119.

"The request for accommodation must be 'sufficiently direct and specific,' giving notice that she needs a 'special accommodation.'" Calero-Cerezo v. US Dep't. of Justice, 355 F. 3d at 23 (citation omitted; quotations omitted) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001)). This means merely "inform[ing] the employer of the need for an adjustment due to a medical condition." Zivkovic v. S. California Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002). See also Palmer v. McDonald, 824 F. App'x 967, 979 (11th Cir. 2020) (citing Reed v. LePage Bakeries, Inc., 244 F.3d at 261 and quoting E.E.O.C. v. Chevron Phillips Chem. Co., 570 F.3d 606, 621 (5th Cir. 2009)). A doctor's note should suffice. See Bultemeyer v. Ft. Wayne Community Schs., 100 F.3d 1281, 1285 (7th Cir. 1996) (an employee with a known psychiatric disability requested reasonable accommodation by stating that he could not do a particular job and by submitting a note from his psychiatrist). There are no "magic words." Bajandas v. Cupeyville, Inc., 61 F. Supp. 3d 218, 220 (D.P.R. 2014).

"In some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation. . . .  As this court has noted, this interactive process requires a great deal of communication between the employee and employer. . . .  An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute." Calero-Cerezo v. US Dep't. of Justice, 355 F. 3d 6, 23 (1st Cir. 2004) (citations omitted; quotations omitted.)

"Other circuits have also found that both the employee and a responsible representative of the employer have a duty to participate in this process.  See, e.g., Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir.1997) ('We agree that both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith.'); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996) ('A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.'); Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996) ('[O]nce an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer.  Thus, it

is the employee's initial request for accommodation which triggers the employer's obligation to participate in the interactive process of determining one.'). <u>Calero-Cerezo v. US Dep't. of Justice</u>, 355 F. 3d at 24. <u>See</u> <u>also</u> <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 F.3d 91, 104 (1st Cir. 2007) (quoting 29 C.F.R. § 1630.9)[3] ("'Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer *must* make a reasonable effort to determine the appropriate accommodation.'") (Emphasis added.)

Mr. Sutherland told Peterson's Oil in November of 2019 that he had a torn meniscus, had been seen by a doctor, needed surgery, and that his doctor wanted him working less than 40 hours per week. <u>Infra</u>, p. 14. He told them he was in unbearable pain. <u>Infra</u>, p. 14. Peterson's Oil did not respond to this request. <u>Infra</u>, p. 14. In December of 2019, Mr. Sutherland told Peterson's Oil that he had a torn meniscus, arthritis, a torn ACL, would be having surgery in January, and that he needed to work no more than six hours per day per his doctor. He provided a doctor's note stating such restrictions due to knee pain and swelling. <u>Infra</u>, pp. 14-16. If Sutherland's Oil wanted a diagnosis from the doctor's mouth rather than Mr.

---

[3]    "The EEOC's interpretive guidance on Title I of the ADA, 29 C.F.R. pt. 1630, app., while not controlling upon the courts by reason of [its] authority, do[es] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 at 104 n.13 (quotations omitted).

Sutherland's alone, it was on them to ask for such a note.  Everyone knows what a torn meniscus is, what surgery is, and heard from Mr. Sutherland in extreme pain every day.  They knew what was going on and that alone placed a duty on them to interact with Mr. Sutherland rather than ignore him as they did.  The facts here are similar to Calero-Cerezo v. US Dep't. of Justice, 355 F. 3d at 24-25, and as such, likewise "sufficient to generate an issue for a factfinder when viewed in the light most favorable to the plaintiff."  Id. at 24.

**b. It would be hard to find a juror that could reasonably conclude that Mr. Sutherland was *not* disabled under the law.**

Working backwards in the elements of an ADA claim, Mr. Sutherland was and remains disabled under the law.  "The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment."  Wright v. CompUSA, Inc., 352 F.3d 472, 475 (1st Cir. 2003).

The terms "disability," "substantially limits" and "major life activities," shall be construed *broadly* under the ADA.  See P.L. 110-325, 122 Stat. 3553 (2009 amendments corrected courts' narrow interpretation); 42 U.S.C.A. §§ 12101 and 12102; Mancini v. City of Providence, 909 F.3d 32, 40-44 (1st Cir. 2018).  Chapter 151B, likewise, should be afforded the same broad interpretation.  See Massasoit Indus. Corp. v. Massachusetts Comm'n Against Discrimination, 91 Mass. App. Ct.

208, 213 n.6, 73 N.E.3d 333 (2017); <u>Flagg v. AliMed, Inc.</u>, 466 Mass. 23, 28-33, 992 N.E.2d 354 (2013).

"In September 2008, Congress broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 ('ADAAA' or 'amended Act'). In response to a series of Supreme Court decisions that Congress believed improperly restricted the scope of the ADA, it passed legislation with the stated purpose of 'reinstating a broad scope of protection to be available under the ADA.' <u>Id.</u> § 2(b)(1). Particularly relevant to this case, Congress sought to override <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 199, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), in which the Supreme Court had adopted a strict construction of the term 'disability' and suggested that a temporary impairment could not qualify as a disability under the Act. Congress believed that <u>Toyota</u> set an 'inappropriately high level of limitation necessary to obtain coverage under the ADA.' Pub.L. No. 110-325, § 2(b)(5)." <u>Summers v. Altarum Institute, Corp.</u>, 740 F. 3d 325, 329 (4th Cir. 2014).

"Abrogating <u>Toyota</u>, the amended Act provides that the definition of disability 'shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by [its] terms.' 42 U.S.C. § 12102(4)(A). Further, Congress instructed that the term 'substantially limits' be interpreted consistently with the liberalized purposes of the ADAAA. <u>Id.</u> §

12102(4)(B)."  Summers v. Altarum Institute, Corp., 740 F. 3d 325, 329 (4th Cir.

2014).  "This is a task that the Supreme Court has described as 'not onerous.'"

Mancini v. City of Providence, 909 F.3d at 38-39 (*prima facie*).

Thus, a sufficiently severe *temporary* injury *is* a disability under the ADA.

See Mancini v. City of Providence, 909 F.3d at 40-41 (1st Cir. 2018); 29 C.F.R. §

1630.2.(j)(1)(ix).  So too is the case under c. 151B.  Massasoit Indus. Corp. v.

Massachusetts Comm'n Against Discrimination, 91 Mass. App. Ct. at 213 n.6

(citations omitted).  A temporary knee injury may constitute an actual disability,

provided a plaintiff avers to facts "sufficient to overcome the 'relatively low

bar[,]'" rather than the mere conclusion that the "'knee injury substantially limited

his ability to stand . . . .'"  Mancini v. City of Providence, 909 F.3d at 43-44.  See

also Hamilton v. Westchester Cnty., 3 F.4th 86, 95 (2d Cir. 2021) (a person with a

torn meniscus, in excruciating pain, placed in situations where such is exacerbated,

regardless of the length of injury, can be disabled under the law).

"The ADA contains a further definition of disability," that is to be

"'regarded as' having a disability.  See 42 U.S.C. § 12102(1)(C)."  Mancini v. City

of Providence, 909 F.3d at 45.  An impairment lasting fewer than six months may

also qualify as a disability under the "regarded-as" prong.  Eshleman v. Patrick

Indus., Inc., 961 F.3d 242, 247-48 (3d Cir. 2020) (only impairments that are both

transitory *and* minor are excluded from coverage).  "Unlike 'actual disability' and

'record of disability' claims, 'regarded as' claims require only a showing that the plaintiff 'has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment.'  42 U.S.C. § 12102(3)(A).  It is not necessary for the plaintiff to prove that the impairment limits or is perceived to limit a major life activity."  <u>Mancini v. City of Providence</u>, 909 F.3d at 45.  "To establish a prima facie 'regarded as' claim . . . , a plaintiff must show, as relevant here, that he had an actual or perceived impairment and that his employer was either aware of or perceived the impairment at the time of the allegedly discriminatory action."  <u>Id.</u>

It is common knowledge that there is nothing transitory about arthritis.  As for a torn meniscus and ACL, sometimes surgery works and sometimes it doesn't.  That it did here has no bearing on whether Mr. Sutherland was disabled *when he requested the accommodation*.  Mr. Sutherland has been factual, *e.g.*, Appx 518-520, 821; not conclusory (<u>Mancini</u>'s mistake) – at every step of the process as to all of the actual restrictions and pain caused by his knee conditions.  Again, Mr. Sutherland informed Mr. Morris of his torn meniscus in November and that his doctor recommended he work no more than 40 hours per week.  In December, and upon further tests, he informed Peterson's Oil that he also had arthritis and a torn ACL and that his knee required surgery in January and that he could not work more than 6 hours per day, with such restriction confirmed by doctor's note.  How

could any reasonable juror *not* conclude that Mr. Sutherland was disabled on these facts? According to the District Court judge, all 12 of them. Appx 17-18. She seems perturbed by the fact that his diagnosis was confirmed "by a single note from his doctor" and his "own complaints of pain." Appx 17. It is unclear where else they are they supposed to come from. If she is referring to expert testimony, such is never required for a "regarded as" claim, and even as to actual disability, it is not required for common things like a knee injury; see <u>Mancini v. City of Providence</u>, 909 F.3d at 41-42. The judge made a mountain out of what is supposed to be a mole hill – a mole hill with a jury on the other side.

### c. A six-hour workday is a reasonable accommodation at Peterson's Oil, not the least because it is afforded to another technician.

"Reasonable accommodations may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations for individuals with disabilities.' 42 U.S.C. § 12111(9)(B). A careful, individualized review of an accommodation request in light of the specific facts of the case is needed to determine whether the request was reasonable. . . . To show that a proposed accommodation was reasonable, a plaintiff must prove not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." <u>Calero-Cerezo v. US Dep't. of Justice</u>, 355 F. 3d at 23 (citation omitted; quotations omitted.)

In order to grant summary judgment, the judge had to find "that a reasonable jury could *only* find that the ability to work [over six hours] was an essential function of [Mr. Sutherland's job]." <u>Faidley v. United Parcel Service of America, Inc.</u>, 889 F. 3d 933, 941 (8th Cir. 2018). The record simply in no way supports that. Perhaps that is why the judge summarily and without analysis concluded that "a shorter work week, along with no on-call duty and performing no installations, taken as whole, do not constitute" a reasonable accommodation. Appx 18. First, not working nights and not doing installations were *not* part of Mr. Sutherland's request for accommodation, those were bargained-for agreements made when Mr. Sutherland took the job. And the fact that they were bargained for, *ipso facto*, makes them reasonable, because they are not essential if they hired him with the understanding that he will *not* do those things. Half of the crew didn't do installations – of course it wasn't essential. The only *request for accommodation* was that he work less than 8 hours per day in November and then less than 6 hours per day from December until he went out for surgery. Unlike in <u>Faidley</u>, which was dominated by a union contract, a reasonable juror could easily conclude that Peterson's Oil could accommodate a part time worker. For one, *they had one on staff*, Mark Hume. Appx 137, 229-30, 327, 485. So clearly they could do it if they wanted to. There is no collective bargaining agreement here or bargained for job requirement to work a specific number of hours like there was in <u>Faidley</u>.

Peterson's Oil admitted that they can estimate calls and Mr. Sutherland has more than adequately placed the issue in dispute with his description of how his days were organized.  Appx 68-70.  This should be put to a jury.

**d. Mr. Sutherland had a record of disability when he was fired without logical justification in one of the most bizarre manners possible, without being told for months.**

Mr. Sutherland was terminated with a "'record of disability[,]' [which] may be satisfied by a showing that the plaintiff had a disability in the past (even though he no longer suffered from that disability when the allegedly discriminatory action took place[.]" Mancini v. City of Providence, 909 F.2d at 40.  Although upon returning from leave Mr. Sutherland no longer likely had an actual or perceived disability claim because he had been cleared to return from work, he did have a record of both.  Of the 5 technicians on out PPP leave, Mr. Sutherland was the *only* one fired and the only one with a recent disability.  And the math as to why, *i.e.*, a decline in business, literally, doesn't add up.  Infra, p. 19.  Because pretext is equally supportive of his claim that he was fired for taking leave, the fallacy that Mr. Sutherland was terminated because there wasn't enough work continues into the next section.

**e. Mr. Sutherland was the only tech fired out of fifteen and the only one on accommodation leave at a time that they *needed* more technicians. Coincidence?  A reasonable jury could think not.**

Contrary to the trial judge's misunderstanding; Appx 20; Mr. Sutherland's retaliation claim is based on his termination from employment, not any sort of failure to accommodate; Appx 32, 33; ECF No. 69, pp. 7-9; ECF No. 80, p. 3.

"An ADA plaintiff need not succeed on a disability claim to assert a claim for retaliation.  Massachusetts's anti-discrimination law also treats retaliation as a 'separate and independent cause of action.' . . .  [A plaintiff's] failure to establish a disability does not preclude his retaliation claim."  Wright v. CompUSA, Inc., 352 F.3d at 477 (citations omitted).

A request for accommodation constitutes "protected activity," *i.e.*, activity protected from retaliation under the ADA.  Wright v. CompUSA, Inc., 352 F.3d  at 477-78 ("We now *hold* that requesting an accommodation is protected activity for the purposes of [the ADA]."  [Emphasis added.]).  So too should be the case under c. 151B.  Cf. Flagg v. AliMed, Inc., 466 Mass. at 32 (c. 151B to be construed liberally); Malley v. Massachusetts Off. on Disability, No. 17-P-1413, 2019 WL 1254697, *3-4 (Mass. App. Ct. Mar. 18, 2019) (undisputed that requesting leave is protected activity).

Requests for leave and modified work schedules *are* requests for accommodation under the ADA and c. 151B.  See Criado v. IBM Corp., 145 F.3d

437, 443 (1st Cir. 1998); Massachusetts Commission Against Discrimination, Guidelines: Employment Discrimination on the Basis of Handicap, Chapter 151B, § X.B (1998) (MCAD Guidelines) (available at https://www.mass.gov/doc/mcad-guidelines-on-disability-discrimination-in-employment/download), as cited to in Barbuto v. Advantage Sales and Marketing, LLC, 477 Mass. 456, 461, 78 N.E.3d 37 (2017) (substantial deference is to be given to MCAD guidelines; id., 460-461).

"Temporal proximity of an employee's protected activity to an employer's adverse action can be sufficient circumstantial evidence of causation to survive summary judgment." Workman v. Outfront Media, LLC, 474 F. Supp. 3d 373, 377 (D. Mass. 2020), citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991). Although temporal proximity *can* be sufficient to survive summary judgment, it is not sufficient alone. See Freadman, 484 F. 3d at 101. Unlike in Freadman, however, Peterson's Oil's refusal to grant PPP to Mr. Sutherland but provide it to a third of its technicians who were *not* out on leave meets the definition of "idiosyncratic." Freadman, 484 F. 3d at 101. Further troubling is that another technician swore that there was plenty of work because of all the technicians out on Covid leave and, thus, Peterson's Oil is lying. Not even their own numbers demonstrate that there was a switch to installations. And even if there had been, *half* of technicians did not do them, but Mr. Sutherland *did*.

Literally every justification that Peterson's Oil has given has a gaping hole in it that needs resolving by a trier of fact.

### III. A reasonable jury could also conclude that Mr. Sutherland was terminated because of his opposition to biofuel, which is protected activity.

It is common law[4] wrongful termination in violation of public policy to terminate an employee because they "report, *resist*, or refuse to participate in activity that presents a threat to public health or safety." Surprise v. Innovation Grp., Inc. / First Notice Sys., Inc., 925 F. Supp. 2d 134, 148 (D. Mass. 2013) (citing Falcon v. Leger, 62 Mass. App. Ct. 352, 364-65, 816 N.E.2d 1010 (2004) and Hobson v. McClean Hospital, 402 Mass. 413, 416-17, 522 N.E.2d 975 (1988)). Purely internal objections to management will suffice. Falcon v. Leger, 62 Mass. App. Ct. at 364 ("We look essentially to the substance of the complaint rather than to whom it is presented.") On the other hand, "the public policy exception does not protect at-will employees from termination for performing generally socially desirable duties or for raising workplace complaints about internal company matters." Murray v. Warren Pumps, LLC, 821 F.3d 77, 89-90 (1st Cir. 2016).

---

[4]     Plaintiff's claim for wrongful termination is not based false claims submitted to the government, but public safety.  Appx 34.  The trial court got it right, Plaintiff did not oppose submitting false claims to the government.  Appx 21. Thus, the False Claims Act does not preempt his common law claim.  See Elliott-Lewis v. Abbott Laboratories, Inc., No. 14-CV-13155-IT, 2018 WL 1122359, at *1-2 (D. Mass. Mar. 1, 2018).

It is hard to imagine a more important public policy than protecting the homes and lives of citizens.  Opposing deceptive business practices is not *necessarily* protected, but it *can* be.  <u>See</u> <u>Mistishen v. Falcone Piano Co. Inc.</u>, 36 Mass. App. Ct. 243, 245, 630 NE.2d 294 (1994).  And if it can be, this is when it *should* be.  The record is replete with Mr. Sutherland's opposition to high content biofuel and the wreckage it caused and death it would likely cause.  He protested to anyone that would listen, mostly Ms. Costigan, but also Mr. Morris and even Mr. Peterson himself at a hotel function.  Mr. Sutherland told customers and this caused Ms. Peterson Halus to instruct Ms. Costigan to stop sending him on "no heat" calls so he would stop spreading the word.  There are photos and details of home heating oil systems destroyed because of Peterson's Oil.  It was a problem for Peterson's Oil, and they found their excuse to get rid of it: Covid.  Mr. Sutherland, however, was not terminated because of a lack of work because there was no lack of work.  Their own numbers don't reflect it and another tech at the time denies it.  So if not that, why?  This sounds like a job for a jury.

CONCLUSION

Wherefore, it is respectfully requested that this Court vacate the District

Court's summary judgment and final judgment orders and remand for trial.  It is

further requested the award of costs.

Respectfully submitted,
Plaintiff-Appellant,
By his attorney,

Dated: July 10, 2024                    */s/ Lucas Newbill*
Lucas Newbill
1st Cir. Bar # 1192218
Law Offices of Lucas Newbill
P.O. Box 1741
Brookline, Massachusetts 02446
Tel. 617-918-7567
lucas@lucasnewbill.com

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,969 words.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

*/s/ Lucas Newbill*
Lucas Newbill

Dated: July 10, 2024

CERTIFICATE OF SERVICE

I hereby certify that this brief and addendum was filed this day through the court's electronic-filing system (CM/ECF) and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF).  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Lucas Newbill*
Lucas Newbill

Dated: July 22, 2024

ADDENDUM

**Table of Contents**

| Document | ECF No. | Document No. |
|---|---|---|
| Memorandum and Order on Motion for Summary Judgment | 82 | 1 |
| Judgment | 83 | 15 |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____ )
JESSE SUTHERLAND,                          )
     Plaintiff,                           )
                                           )
v.                                         )        CIVIL ACTION
                                           )        NO. 21-10902-MRG
PETERSON OIL SERVICE, INC.                 )
     Defendant.                           )
_____ )


**MEMORANDUM OF DECISION AND ORDER**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**March 31, 2024**

GUZMAN, J.

      This action arises out of the former employment relationship between Defendant, Peterson Oil Services, Inc. ("Peterson's" or "Defendant"), and its former employee, Jesse Sutherland ("Mr. Sutherland" or "Plaintiff"). Mr. Sutherland asserts claims against Defendant for failure to accommodate, disability discrimination, and retaliation in violation of Mass. Gen. Laws Ch. 151B; disability discrimination and retaliation in violation of the Americans with Disabilities Act; earned sick time retaliation in violation of Mass. Gen. Laws Ch. 149; violation of the federal False Claims Act; violation of the Massachusetts False Claims Act; and termination in violation of public policy. Defendant now moves for summary judgment as to all claims. The Court heard oral argument on August 11, 2023, and allowed the parties to submit supplemental post-hearing briefs. For the reasons stated below, summary judgment is GRANTED.

**I.**     **Background**

      Peterson's is a family owned and operated business that provides heating oil, cooling, and

Add 1

energy services to families and businesses. Plaintiff Jesse Sutherland ("Mr. Sutherland") began working for Peterson's as a Service Technician in August of 2019. At all times relevant to this matter, Mr. Sutherland worked as a Service Technician for Peterson's. As a Service Technician, Mr. Sutherland reported to Peterson's Worcester office, and he was primarily responsible for servicing heating oil systems on a routine or emergency basis. During his interview for the position, Mr. Sutherland requested that Peterson's not assign him to participate in large equipment installation and further requested not to participate in Peterson's on-call rotation; Peterson's agreed to both of these requests, however Sutherland performed several installations at the request of Peterson's during the course of his employment. Ryan Morris, a service manager at Peterson's, was Mr. Sutherland's supervisor. Dianna Costigan was a dispatcher at Peterson's and was responsible taking customer calls and assigning service technicians to the service calls.[1]

Mr. Sutherland's knee injury first surfaced on October 8, 2019. Mr. Sutherland told Peterson's the same day. On November 8, 2019, Mr. Sutherland requested time off from work from November 8, 2019, through November 11, 2019, due to his knee injury. Peterson's granted his requested leave. On November 15, 2019, Mr. Sutherland left work early and stated that he would not be coming to work on November 16, 2019, due to his knee injury. Peterson's granted his requested time off. On November 18, 2019, Ms. Costigan assigned Mr. Sutherland a service call. Mr. Sutherland responded that he could not take that call due to his knee injury. Ms. Costigan replied, "just disregard I'll find something else." On or around November 21, 2019, Mr. Sutherland requested to reduce his hours to no more than 40 per week due to a knee injury. Peterson's asked

---

[1] Plaintiff does not dispute that Ryan Morris was his supervisor, but also believed that Dianna Costigan served as one of his supervisors, which Peterson's denies. This Court credits the testimony of Kristen Peterson-Halus, who stated that Costigan only served in the dispatcher position and although in that position would act as a go-between management and the service technicians, did not hold any supervisory responsibility for Plaintiff's position. Kristen Peterson-Halus Declaration, Docket No. 67-2, ¶ 4.

Mr. Sutherland to provide a doctor's note supporting his request. On or around December 18, 2020, Mr. Sutherland provided Morris with a doctor's note stating that Mr. Sutherland could not work more than thirty hours—five days per week, six hours per day—for an indefinite period of time, due to knee pain and swelling. His manager informed Ms. Peterson-Halus of his request for reduced hours. Mr. Sutherland contends that the request was neither granted nor denied by Peterson's.[2]

On or around December 18, 2019, Mr. Sutherland informed Mr. Morris that he would be on leave beginning on January 27, 2020, due to a knee surgery. Mr. Morris informed Ms. Peterson-Halus that Mr. Sutherland would be out on leave beginning on January 27, 2020. Ms. Peterson-Halus granted this request for leave.

On January 20, 2020, Mr. Sutherland informed Michelle Chapdelaine that he could not perform a water heater installation as his first service call on the morning of January 21, 2020, because he had slipped the day before and hurt his knee. Ms. Chapdelaine replied, "Ok, no problem." and provided Mr. Sutherland with a furnace installation call, which Mr. Sutherland said that he also could not perform. Ms. Chapdelaine again replied, "Ok. Hold on." and assigned Mr. Sutherland to a tune up. Mr. Sutherland did not state that this call was unsuitable.[3]

The beginning of the Covid-19 Pandemic in March of 2020 introduced new challenges for many businesses, Peterson's included, in providing services to its customers. With a reduction in

---

[2] Peterson-Halus determined that Peterson's was unable to schedule Plaintiff for a set number of hours per day, as Peterson's could not guarantee how long any given call, and consequently any shift, would take. The length of a call depended on, among other things, commuting time to and from the job, the type of job, the availability of the homeowner, the need to obtain equipment or supplies, and the discovery of unexpected conditions that were not evident or conveyed to Peterson's when the customer requested a service call. Peterson-Halus contends that it was an essential function of a service technician to complete an entire service call in one visit whenever possible. Plaintiff disputes that Peterson's was unable to estimate the time a service call would take and therefore be able to modify his hours in a day to only six hours.

[3] Plaintiff and Peterson's dispute the level of assistance or flexibility Plaintiff was granted on two other service calls, one on January 1, 2020, and one on January 20, 2020.

Add 3

prescheduled and routine maintenance service calls due to customer concerns with social distancing, Peterson's attempted to offset the reduction in work by assigning its service technicians to installations and recycling the backlog of scrap metal that resulted from the installs. Peterson's also had several of its employees request and receive Covid-related leaves from work. According to Peterson-Halus, due to the reduction of business overall, Peterson's decided to eliminate one of its service technician positions. Peterson's decided to terminate Mr. Sutherland's employment because he was less available and less willing than the other employees to perform the work. He was the only active service technician who requested to not perform both installations and on-call work. Peterson-Halus Decl. ¶ 14. Peterson's terminated Mr. Sutherland's employment on April 20, 2020, and send him a letter notifying him of this on May 26, 2020.

During the course of Mr. Sutherland's employment at Peterson's, Mr. Sutherland frequently conveyed his opinion regarding the use of biofuel and its effects on oil burners and oil tanks. Mr. Sutherland believes that his complaints about the use of biofuel to customers and other employees at Peterson's was the main reason for his termination.[4] Mr. Sutherland, through his own research and experience, held a personal belief that the level of biofuel in heating oil could cause damage or lead to safety issues to a heating system. He told Ryan Morris "all the time" that biofuel was negatively impacting Peterson's customers oil burner systems and tanks. During a conversation with Service Technician Rick Minkema and a Peterson's dispatcher on November 1, 2019, Mr. Minkema told the dispatcher that if it wasn't for biofuel, he wouldn't be servicing customers' equipment as frequently. Mr. Sutherland expressed his agreement with Minkema. Mr. Minkema and Mr. Sutherland continued to discuss that biofuel negatively impacted customers' equipment. On the same date, Peterson's employee Bahareh Pirayesh reported to Ms. Peterson-

---

[4] Sutherland Depo, Docket No. 67-3, p. 92, at 4-8. Plaintiff also mentions age discrimination several times, but has not raised any age discrimination claims and therefore has abandoned these claims.

Add 4

Halus and Mr. Peterson that she overheard Mr. Sutherland and Mr. Minkema complaining about the "amount of calls that [Peterson's] get[s]" and attributing the amount of calls to biofuel. Mr. Sutherland never reported a violation of a law or regulation at Peterson's, nor did he report a violation of any professional standard.

Mr. Sutherland filed a charge with the Massachusetts Commission Against Discrimination (MCAD) on October 5, 2020. The MCAD allowed Mr. Sutherland to voluntarily withdraw that complaint on March 15, 2021. Mr. Sutherland filed this action on June 2, 2021.

## II.    <u>Standard of Review</u>

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Carroll v. Xerox Corp</u>., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'" <u>Sensing v. Outback Steakhouse of Florida</u>, <i>LLC</i>, 575 F.3d 145, 152 (1st Cir. 2009) (<u>quoting</u> <u>Calero-Cerezo v. U.S. Dep't. of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-moving party and makes all reasonable inferences in favor thereof. <u>Sensing</u>, 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. <u>Id</u>., at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" <u>Id</u>. (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the

[movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." Id. (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences." Id. (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " Id. (citation to quoted case omitted).

*Disability Discrimination under the ADA and Mass. Gen. L. c. 151B*

Mr. Sutherland's primary claims are that Peterson's terminated his employment and failed to accommodate him in violation of the anti-discrimination and anti-retaliation provisions of the ADA, G.L. c. 151B, and the Massachusetts Earned Sick Time Law

Massachusetts law declares it unlawful.

> For any employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

Mass. Gen. L. c. 151B, § 4(16). The ADA provision is substantially similar, including "[t]he statutory definitions of 'disability' under federal law and 'handicap' under Massachusetts law." Brader v. Biogen, Inc., 983 F.3d 39, 54 n.22 (1st Cir. 2018). As the elements for a disability discrimination claim under Chapter 151B are identical, Miller v. Verizon Communications, Inc., 474 F.Supp.2d 187,194 the "[the First Circuit] analyze[s] claims under the ADA and under Massachusetts General Laws chapter 151B using the same framework," Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012). The two statutes, therefore, can be considered together.

Add 6

Under both statutes, because Mr. Sutherland has not offered direct evidence of discrimination, the Court applies the framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which requires a plaintiff to set forth a "three-factor prima facie case." Jones, 696 F.3d at 86. Here, Mr. Sutherland must show that "[he] ha[d] a handicap [or disability, under the ADA]; that he was nonetheless qualified to perform the essential functions of the job, with or without reasonable accommodation; and that, despite the foregoing, [Peterson's] discharged him." Miceli v. JetBlue Airways Corp., 914 F.3d 73, 81 (1st Cir. 2019). With respect to a claim based on the employer's failure to provide reasonable accommodation, the third prong of the prima facie case can be satisfied by a showing that the employer "despite knowing of [the employee's] alleged disability, did not reasonably accommodate it." Sensing v. Outback Steakhouse of Florida, LLC, 575 F.3d 145, 157 (1st Cir.2009) (citation to quoted case omitted).

If Mr. Sutherland can make that prima facie showing, "[t]he burden of production . . . shifts to [Peterson's], which must proffer a legitimate reason for the adverse employment action." Miceli, 914 F.3d at 81. Should Peterson's provide a legitimate reason for terminating Mr. Sutherland's employment, he then must demonstrate "that the adverse employment action was taken 'because of' his handicap and 'not for the reason proffered by the employer.'" Id. at 82, quoting Gannon v. City of Boston, 476 Mass. 786, 793 (2017). Mr. Sutherland must show that Peterson's proffered reason was pretextual or that Peterson's "harbored discriminatory animus." Brader, 983 F.3d at 58.

Plaintiff alleges that he is disabled because of his knee injury, a condition he argues has affected his ability to straighten his knee and walk without difficulty, work more than 6 hours per day and perform some of the more labor-intensive functions of his job as a Service Technician, such as installations. Having an impairment, however, is not enough to claim protection under the ADA. See Whitlock v. Mac-Gray, Inc., 345 F.3d 44, 46 (1st Cir. 2003). In order to be considered

Add 7

disabled under the definition of the ADA, a person must "(1) have a physical or mental impairment that substantially limits one or more life activity; (2) have a record of having such impairment; or (3) be "regarded as" having such an impairment." 42 U.S.C. § 12102(2); <u>Cosme-Perez v. Municipality of Juana Diaz</u>, 110 F.Supp. 3d 357, 365 (D.P.R. 2015). Merely alleging impairment is not enough to claim protection under the ADA. <u>Id</u>. "[E]vidence of impairment which is supported only with a medical diagnosis or conclusory assertions of disability by a physician are insufficient to show disability for purposes of the ADA." <u>Id</u>., (quoting <u>Perez v. Saint John's School</u>, 814 F.Supp. 2d. 102, 117 (D.P.R. 2011)). Mr. Sutherland's impairment in this case is supported by a single note from his doctor, which he gave to Peterson's in December of 2019 when he requested leave to have surgery, and his own complaints of pain and discomfort to fellow employees at Peterson's. Mr. Sutherland has not shown that he was disabled by proving he had "a physical or mental impairment that substantially limits one or more [of his] major life activities." 42 U.S.C. § 12102(1). Indeed, Mr. Sutherland admitted that his injury was temporary and that he was ready and able to work in his full capacity following his surgery with no limitations. Accordingly, even drawing all reasonable inferences in Mr. Sutherland's favor, the Court concludes that he is not disabled within the meaning of the law, nor does he have a record of such an impairment.

As to the third element, under the regulations, an individual who has an impairment that is not substantially limiting (or has no impairment at all) is nevertheless "disabled" if he is regarded by the employer as having an impairment that does substantially limit major life activities. <u>See Katz v. City Metal Co., Inc.</u>, 87 F.3d 26, 32 (1st Cir. 1996). Mr. Sutherland can not rely on this theory of liability under the ADA as the record evidence does not support his claim. Although Mr. Sutherland sometimes mentioned his knee pain when he received a service call from Peterson's or

Add 8

when he requested a 6-hour workday does not show that Peterson's regarded him as disabled. "A plaintiff claiming that he is 'regarded' as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that the employer regarded him as disabled within the meaning of the ADA." <u>Bailey v. Georgia–Pacific Corp.</u>, 306 F.3d 1162, 1169 (1st Cir.2002)(emphasis in original).

Finally, even assuming *arguendo* Mr. Sutherland was disabled within the meaning of the statute, he failed to proffer sufficient evidence that he could perform his duties with or without any reasonable accommodations as required by ADA. *See* 42 U.S.C. § 12111(8) and (9). To survive summary judgment on a failure-to-accommodate claim, a plaintiff must prove that: "(1) he [or she] is disabled within the meaning of the ADA, (2) he [or she] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [his or her employer], despite knowing of [his or her] disability, did not reasonably accommodate it." <u>EEOC v. Kohl's Dep't Stores, Inc.</u>, 774 F.3d 127, 131 (1st Cir. 2014)."

Working a shorter work week, along with no on-call duty and performing no installations, taken as a whole, do not constitute "reasonable" accommodations for a service technician in his industry. <u>See</u> <u>Equal Employment Opportunity Commission v. Amego, Inc.</u>, 110 F.3d 135, 148-149 (1st Cir.1997). Furthermore, there is no evidence that Mr. Sutherland requested any accommodations after he brought in his only medical documentation, the doctor's note stating he would be having surgery. Mr. Sutherland's requests were made prior to being diagnosed. ADA claims require that requests for accommodation be expressly made and must show a link between the accommodation and a disability. <u>See</u> <u>Cruz Carrillo v. AMR Eagle, Inc.</u>, 148 F.Supp.2d 142, 146 (D.P.R.2001).[5]

---

[5] The First Circuit has not regarded an employer's participation in the interactive process as a requirement under the ADA. <u>See</u> <u>EEOC v. Kohl's</u>, 774 F.3d at 132, n.5. Mr. Sutherland contends that because he did not receive a formal

Add 9

*Retaliation Claims*

Counts IV, V and VI include an allegation that Defendant retaliated against Mr. Sutherland in violation of the ADA, Chapter 151B and use of his sick time under Mass. Gen. L. c. 149.[6] Retaliation is an independent cause of action under both statutes.[7] Wright v. CompUSA, Inc., 352 F.3d 472, 477 (1st Cir.2003) (noting that a plaintiff need not succeed on a discrimination claim to bring a retaliation claim); see also 42 U.S.C. § 12203(a); Mass. Gen. Laws c. 151B, § 4. To make out a prima facie case of retaliation, Mr. Sutherland must demonstrate that he (i) engaged in protected conduct, (ii) was subjected to an adverse action by the defendant, and (iii) there was a causal connection between the protected conduct and the adverse action. D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012).[8] If Mr. Sutherland establishes a prima facie case, the burden shifts to the Defendant to articulate a legitimate, non-retaliatory explanation for the adverse action. *Id.* Once Defendant meets its obligation, the burden shifts back to Mr. Sutherland to show that the proffered legitimate explanation is a pretext and that the Defendant was, in actuality, motivated by a retaliatory animus. *Id.* "Temporal proximity of an employee's protected activity to an employer's adverse action can be sufficient circumstantial evidence of causation to survive summary judgment." Workman v. Outfront Media, LLC, 474 F. Supp. 3d 373, 377 (D. Mass. 2020), citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991).

---

response to his request for shorter days, Peterson's did not engage in the interactive process and cites to caselaw in his brief that suggests this is prima facie evidence that Peterson's may be acting in bad faith. While this Court has determined that Mr. Sutherland is not disabled within the meaning of the law, it bears mentioning that Peterson's did reduce Mr. Sutherland's workload on an informal basis to the extent it was possible in a given workday. He was allowed to decline certain calls if his day had been too long, was sent assistance from another service technician, or allowed to end his day before taking on another call.

[6] Mr. Sutherland's only evidence to support his claim of a causal connection between his use of sick leave (which was granted by Peterson's each time he requested) and his termination, was his testimony that he believed "companies don't like you to do that, so I feel they may have had an issue with it." Sutherland Depo., Docket No. 67-3, at 3-5.This is insufficient to support his claim in Count VI.

[8] The standard for a retaliation claim under the ADA and Rehabilitation Act is the same. *Id.*

Add 10

Here, however, because Mr. Sutherland's retaliation claims under G.L. c. 151B and the ADA are identical to his failure to accommodate claims, they cannot proceed as separate retaliation claims. Rodriguez v. JetBlue Airways Corporation, No. 12–11531–RGS, 2012 WL 6632823, at *3 (D.Mass. 2012) (citing Cullinane v. Massachusetts Inst. Tech., 1997 Mass. Super. LEXIS 120 (Mass. Super. Ct. 1997)) (rejecting attempt to reframe failure to accommodate claim as disability-related retaliation); Jodoin v. Baystate Health Sys., Inc., 2010 WL 1257985, at *20 (D.Mass. 2010) (finding that retaliation claim "merely reclothes … [an] ADA discrimination claim") (citing Lucas v. WW Grainer, Inc., 257 F.3d 1249, 1261 (11th Cir.2001)). Accordingly, Mr. Sutherland's retaliation claims under G.L. c. 151B and the ADA must be dismissed, to the extent they are based on his requesting a disability-related accommodation.

*False Claims Act*

In addition to his disability discrimination claims, Mr. Sutherland alleges that he was terminated because he complained about the impact that Peterson's biofuel had on its customers' heating equipment, in violation of the federal and state False Claims Acts and public policy. Peterson's argues that the claims must fail because Mr. Sutherland's activity was not protected activity under the law or any valid public policy.

The FCA imposes civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government. 31 U.S.C. § 3729(a)(1)(A). The FCA also "bars an employer from retaliating against an employee 'because of lawful acts done ... in furtherance of an [FCA action] or other efforts to stop 1 or more violations of [the FCA].' " Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019) (second alteration added) (quoting 31 U.S.C. § 3730(h)(1)). This anti-retaliation provision aims "to prevent companies from discouraging potential relators from coming forward." Harrington v. Aggregate

Add 11

Indus. Ne. Region, Inc., 668 F.3d 25, 30 (1st Cir. 2012). A successful FCA retaliation claim requires proof "that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." Guilfoile, 913 F.3d at 187-88 (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 235 (1st Cir. 2004)).

Protected conduct includes any activity "that 'reasonably could lead' to an FCA action," such as "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 59 (1st Cir. 2017) (quoting Karvelas, 360 F.3d at 237). While "the question of whether the employer engaged in conduct that could run afoul of the FCA is a necessary component of this inquiry," the plaintiff need not prove that the employer actually violated the FCA. See Guilfoile, 913 F.3d at 188 & n.9 (emphasis omitted). The conduct the plaintiff objects to or reports, however, must relate to the submission of false claims. See Booker, 847 F.3d at 60. Accordingly, when a plaintiff's FCA retaliation claim is based on a contractual, regulatory, or statutory violation, he must provide some reasonable basis for believing that the violation caused the submission of false claims and was material to the payment of any claims. See Guilfoile, 913 F.3d at 194-95 & n.18.

Because Mr. Sutherland's concerns were focused on Peterson's alleged delivery of biofuel in place of fuel oil in its customers furnaces, not on the fraudulent submission of claims to the government, Sutherland has not shown any violation of the FCA. Peterson's is entitled to summary judgment on the FCA retaliation claim. See Fauci v. Genentech, 2007 WL 3020191, at *4 (D.Mass. Oct. 12, 2007) (dismissing wrongful termination claim because the FCA provides a comprehensive and remedial scheme for vindicating the public policy interests in preventing the submission of

Add 12

false or fraudulent claims to the federal government). Mr. Sutherland's claims that Peterson's disliked that he warned customers about the use of biofuel is not a sufficient basis for a reasonable jury to conclude that Peterson's is liable for discriminating against Mr. Sutherland on the basis of a perceived disability/public policy.

*Public Policy*

In his final claim, Mr. Sutherland contends that Peterson's terminated his employment because of his efforts to protect the public from harm caused by unsafe biofuel in Peterson's oil. Massachusetts courts have delineated three categories of justifications for termination of an at-will employee that violate public policy: 1) "asserting a legally guaranteed right (e.g., filing workers' compensation claim)"; 2) "doing what the law requires (e.g., serving on a jury)"; and 3) "refusing to do that which the law forbids (e.g., committing perjury)." Id. at 89 (quoting Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149-150 (1989)). An employee may also recover if she is terminated for performing certain important public deeds not strictly required by the law. Id. For example, employees are protected from discharge when they make "an internal complaint ... about the alleged violation of the criminal law." Shea v. Emmanuel College, 425 Mass. 761, 762-763 (1997). They are also protected when they "report, resist, or refuse to participate in activity that presents a threat to public health or safety," Surprise v. Innovation Grp., Inc./First Notice Sys., Inc., 925 F. Supp. 2d 134, 148 (D.Mass. 2013). "[T]he alleged harm or threat to health and safety must not be too remote or speculative." *Acher v. Fujitsu Network Commc'ns, Inc.*, 354 F. Supp. 2d 26, 30 (D.Mass. 2005). On the other hand, "the public policy exception does not protect at-will employees from termination for performing generally socially desirable duties or for raising workplace complaints about internal company matters." Murray v. Warren Pumps, LLC, 821 F.3d 77, 89-90 (1st Cir. 2016). The burden lies with the at-will employee to establish

Add 13

that the substance of his workplace complaints for which he was discharged bears a direct connection to a sufficiently important and clearly defined public policy that warrants his protection from termination. Id. at 90. It is a question of law for the judge to decide whether the firing of an at-will employee in certain circumstances would violate public policy. Id., citing Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 472 (1992).

Here, Mr. Sutherland was a vocal opponent of the use of biofuel by Peterson's because he believed it was a public safety threat.[9] He spoke to other employees at Peterson's and often discussed his concerns with Peterson's customers, however, there is no evidence that Mr. Sutherland reported his concerns to anyone outside of Peterson's. Accordingly his actions are too remote and speculative to state a public policy exception claim.

### Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (Docket No. 65) is ***granted*** as to all counts.

SO ORDERED.
Dated: March 31, 2024

/s/ Margaret R. Guzman
MARGARET R. GUZMAN
UNITED STATES DISTRICT JUDGE

---

[9] Mr. Sutherland believed that if a boiler in the home of a Peterson's customer used oil that contained a certain percentage of biofuel, and if the boiler did not have a combustion chamber, the biofuel could cause a leak which could cause a fire.

Add 14

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**


Sutherland,
                    Plaintiff,
                                                    **CIVIL ACTION**

          V.                                        **NO. 21-10902-MRG**

Peterson Oil Service, Inc.,
                    Defendant,


### JUDGMENT


### Guzman J.


        In accordance with the Court's Memorandum and Order dated 3/31/24, granting

Defendant's motion for summary judgment in the above-entitled action, it is hereby

ORDERED:

                    Judgment for the__Defendant__




                                                    By the Court,


_____4/3/24_____                         /s Martin Castles
          Date                                      Deputy Clerk




                                                                        Add 15